# United States Court of Appeals for the Federal Circuit

---

**SECURE AXCESS, LLC,**
*Appellant*

v

**PNC BANK NATIONAL ASSOCIATION, U.S. BANK NATIONAL ASSOCIATION, U.S. BANCORP, BANK OF THE WEST, SANTANDER BANK, N.A., ALLY FINANCIAL, INC., RAYMOND JAMES & ASSOCIATES, INC., TRUSTMARK NATIONAL BANK, NATIONWIDE BANK, CADENCE BANK, N.A., COMMERCE BANK,**
*Appellees*

---

2016-1353

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. CBM2014-00100.

---

Decided: February 21, 2017

---

ANDREW J. WRIGHT, Bruster PLLC, Southlake, TX, argued for appellant. Also represented by ANTHONY KYLE BRUSTER; ERIC M. ALBRITTON, Albritton Law Firm, Longview, TX; ANDRE J. BAHOU, Secure Axcess, LLC, Plano, TX; GREGORY J. GONSALVES, Falls Church, VA.

GREGORY H. LANTIER, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for all appellees. Appellee PNC Bank National Association also represented by BRITTANY BLUEITT AMADI; WEI WANG, Palo Alto, CA.

TERENCE P. ROSS, Katten Muchin Rosenman LLP, Washington, DC, for appellees U.S. Bank National Association, U.S. Bancorp.

ANTHONY H. SON, Barnes & Thornburg LLP, Washington, DC, for appellees Bank of the West, Ally Financial, Inc., Cadence Bank, N.A. Appellee Cadence Bank, N.A. also represented by TONYA GRAY, Andrews Kurth LLP, Dallas, TX; SEAN WOODEN, Washington, DC.

SCOTT WESLEY PARKER, Parker Ibrahim & Berg LLC, Somerset, NJ, for appellee Santander Bank, N.A. Also represented by DIANE RAGOSA.

JASON STEWART JACKSON, Kutak Rock LLP, Omaha, NE, for appellee Raymond James & Associates, Inc.

ERIC C. COHEN, Brinks Gilson & Lione, Chicago, IL, for appellee Trustmark National Bank.

GARRET A. LEACH, Kirkland & Ellis LLP, Chicago, IL, for appellee Nationwide Bank.

MARC WADE VANDER TUIG, Senniger Powers LLP, St. Louis, MO, for appellee Commerce Bank.

––––––––––––––––––

Before LOURIE, PLAGER, and TARANTO, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* PLAGER.

Dissenting opinion filed by *Circuit Judge* LOURIE.

PLAGER, *Circuit Judge.*

This is a patent case—the issue turns on what is a covered business method patent. Appellant Secure Axcess, LLC ("Secure Axcess") challenges a Final Written Decision of the Patent Trial and Appeal Board ("Board" or "PTAB"). As part of that decision, the Board reaffirmed its determination that the patent at issue, U.S. Patent No. 7,631,191 ("'191 patent"), owned by Secure Axcess, was a covered business method ("CBM") patent under § 18 of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011). The Board further held that claims 1–32, all the claims in the patent, were unpatentable under that statute on the grounds that they would have been obvious under the cited prior art.

On appeal, Secure Axcess challenges the Board's determination to decide the case as a covered business method patent, as well as the Board's obviousness determination. We agree with Secure Axcess on the first point and therefore do not reach the second. Recently, in *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376, 1379–82 (Fed. Cir. 2016), we concluded that the Board-adopted characterization of CBM scope in that case was contrary to the statute. We draw the same conclusion here, and further conclude that the patent at issue is outside the definition of a CBM patent that Congress provided by statute.

## BACKGROUND

### 1. The Patent-at-Issue

Secure Axcess owns the '191 patent, which issued from a continuation application of U.S. Patent Application No. 09/656,074. That parent application issued as U.S. Patent No. 7,203,838 ("'838 patent"). The '191 and '838 patents have substantially the same written descriptions.

The '191 patent is entitled "System and Method for Authenticating a Web Page." According to the patent, the "invention relates generally to computer security, and

more particularly, to systems and methods for authenticating a web page." '191 patent at 1:16–18. The claims generally support this broad understanding. Claims 1 and 17 are illustrative.

> 1. A method comprising:
>
> transforming, at an authentication host computer, received data by inserting an authenticity key to create formatted data; and
>
> returning, from the authentication host computer, the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file,
>
> wherein an authenticity stamp is retrieved from the preferences file.

*Id.* at 12:9–18; '191 Certificate of Correction.

> 17. An authentication system comprising:
>
> an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data and to retrieve an authenticity stamp from a preferences file.

'191 patent at 12:62–67; '191 Certificate of Correction.

Similarly, the written description of the '191 patent generally discusses computer security with a focus on authenticating a web page. However, on occasion, the written description contains references that might be considered to concern (at least facially) activities that are financial in nature, a consideration in determining CBM patent status.

For example, in discussing the invention, the written description explains that an Internet user might be misled to the wrong website without proper authentication. To illustrate the problem, the patent uses

"'www.bigbank.com' vs. 'www.b[l]gbank.com' (with an 'l' instead of an 'i')." '191 patent at 1:31–33, *see also id.* at 8:22–24 (again, by way of example, using "'bigbank.com'"). Also, despite typically referring to Internet "users," the patent occasionally refers to "customers," *id.* at 1:28–29, and "consumers," *id.* at 1:44. The written description further explains that "[t]he web server can be any site, for example a commercial web site, such as a merchant site, a government site, an educational site, etc." *Id.* at 3:34–37.

In contrast to such brief references, the last several paragraphs of the written description provide several more detailed and possibly relevant references:

> Moreover, while the exemplary embodiment will be described as an authentication system, the system contemplates the use, sale or distribution of any goods, services or information over any network having similar functionality described herein.

'191 patent at 11:17–21.

> The customer and merchant may represent individual people, entities, or business. The bank may represent other types of card issuing institutions, such as credit card companies, card sponsoring companies, or third party issuers under contract with financial institutions. It is further noted that other participants may be involved in some phases of the transaction, such as an intermediary settlement institution, but these participants are not shown.

*Id.* at 11:22–29. (There is no previous mention of "the bank" in the patent—there is only the "www.bigbank.com" reference. Similarly, the only previous mention of a "merchant" is the "merchant site" at 3:36, and the only previous mention of a "customer" is the "customers" at 1:28–29.)

> Each participant is equipped with a computing system to facilitate online commerce transactions. The customer has a computing unit in the form of a personal computer, although other types of computing units may be used including laptops, notebooks, hand held computers, set-top boxes, and the like. The merchant has a computing unit implemented in the form of a computer-server, although other implementations are possible. The bank has a computing center shown as a main frame computer. However, the bank computing center may be implemented in other forms, such as a mini-computer, a PC server, a network set of computers, and the like.

*Id.* at 11:30–40. (There is no previous mention of "commerce" or a "commerce transaction" in the patent.)

> For instance, the customer computer may employ a modem to occasionally connect to the internet, whereas the bank computing center might maintain a permanent connection to the internet.

*Id.* at 11:46–49.

> Any merchant computer and bank computer are interconnected via a second network, referred to as a payment network. The payment network represents existing proprietary networks that presently accommodate transactions for credit cards, debit cards, and other types of financial/banking cards. The payment network is a closed network that is assumed to be secure from eavesdroppers. Examples of the payment network include the American Express®, VisaNet® and the Veriphone® network. In an exemplary embodiment, the electronic commerce system is implemented at the customer and issuing bank. In an exemplary implementation, the electronic commerce system is implemented as computer software modules

> loaded onto the customer computer and the banking computing center. The merchant computer does not require any additional software to participate in the online commerce transactions supported by the online commerce system.

*Id.* at 11:52–67.

## 2. Procedural History

At the initial decision-to-institute stage, the Board determined that the '191 patent was a CBM patent. After consolidating three separate CBM review proceedings with regard to the '191 patent, in each of which the patent was treated as a CBM patent, the Board issued the Final Written Decision at issue on appeal. *See PNC Bank, N.A. v. Secure Axcess, LLC*, CBM2014-00100; *Bank of the West v. Secure Axcess, LLC*, CBM2015-00009; *T. Rowe Price Inv. Servs., Inc. v. Secure Axcess, LLC*, CBM2015-00027.[1]

In its Final Written Decision, the Board maintained (in keeping with its institution decisions) that the '191 patent was a CBM patent. On the merits, the Board held that claims 1–32 of the '191 patent were unpatentable because they would have been obvious under 35 U.S.C. § 103 in light of the cited prior art.

In applying the statutory test for determining whether a patent is a CBM patent, the Board quoted the statute, which is found in AIA § 18(d)(1) and which is repeated verbatim in the rules of the Patent and Trademark Office ("PTO") at 37 C.F.R. § 42.301(a). Invoking the PTO's rulemaking discussion and this court's opinion

---

[1] In a separate proceeding, the Board declined to institute a fourth CBM review of the '191 patent. *PNC Bank, N.A. v. Secure Axcess, LLC*, CBM2015-00039, 2015 WL 4467374 (PTAB July 10, 2015).

in *Versata*, the Board rejected the patent owner's contention that the '191 patent was not a CBM patent.

The Board first rejected the patent owner's contention that the statutory phrase "financial product or service" included "only financial products such as credit, loans, real estate transactions, check cashing and processing, financial services and instruments, and securities and investment products." J.A. 9 (citation omitted).

The Board acknowledged the scope of the patent: "[t]he '191 patent relates to authenticating a web page and claims a particular manner of doing so." J.A. 10 (citing the '191 patent at 1:16–18, 12:9–18). However, the Board reasoned that because "[t]he '191 patent is directed to solving problems related to providing a web site to customers of financial institutions . . . the '191 patent covers the ancillary activity related to a financial product or service of Web site management and functionality and so, according to the legislative history of the AIA, the method and apparatus of the '191 patent perform operations used in the administration of a financial product or service." J.A. 10–11.

Despite recognizing our guidance in *Versata Development Group, Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015), questioning the use of various legislators' competing statements in the legislative history of the AIA, the Board "note[d] nonetheless that at least one legislator viewed 'customer interfaces' and 'Web site management and functionality,' which are at issue here, as ancillary activities intended to be encompassed by the language 'practice, administration and management' of a financial product or service." J.A. 11 (quoting 157 Cong. Rec. S1364–65 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer)).

Further, while recognizing that the factor was not determinative, the Board observed that the patent owner's allegations of infringement by "approximately fifty finan-

cial institutions is a factor weighing toward the conclusion that the '191 patent claims a method or apparatus that at least is incidental to a financial activity, even if other types of companies also practice the claimed invention." J.A. 11.

The Board stated that the '191 patent disclosed "a need by financial institutions to ensure customers are confident that the financial institution's web page is authentic." J.A. 10 (citing the '191 patent at 1:28–33). The Board also stated that the patent disclosed "alternative embodiments of the invention as being used by financial institutions." *Id.* (citing '191 patent at 8:21–23, 11:23–40, 11:52–67).

The Board then analyzed whether the '191 patent was for a "technological invention"—the exception to the CBM definition pursuant to AIA § 18(d)(1) and 37 C.F.R. § 42.301(b)—and determined that the '191 patent was not for a technological invention. The Board concluded its analysis of the issues, including the question of obviousness, and determined that all 32 claims of the '191 patent would have been obvious over the cited prior art and were therefore unpatentable.

Secure Axcess timely appeals the Board's Final Written Decision; we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

As we have noted, appellant raises two issues on appeal. First, "whether United States Patent No. 7,631,191 is a 'covered business method' patent subject to review under Section 18 of the AIA." Appellant's Br. at 6. Appellant states that "[t]his is a patent-specific question that involves an issue of first impression that has broad implications for other CBM cases: Should a patent's eligibility for CBM review be determined on its claim language in light of the specification as understood at the

earliest effective filing date, or should the PTAB also consider post-grant evidence such as a patent owner's litigation history?" *Id.*

The second issue raised by appellant relates to particular claim constructions made by the Board, which appellant alleges are unreasonable even under the 'broadest reasonable interpretation' standard the Board applied. According to appellant, the Board's claim constructions fatally tainted the obviousness analysis.

## 1. Jurisdiction and Standard of Review

Neither party challenges this court's authority to review on appeal a Final Written Decision of the Board, including, when challenged, whether the Board correctly determined that a particular patent was subject to Board review under the special provisions of AIA § 18 dealing with CBM patents. *See* 35 U.S.C. §§ 329, 141–44; *Versata*, 793 F.3d at 1314–23.

We review the Board's determination regarding whether the '191 patent is within the scope of the CBM statute under the Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706(2): "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."[2]

Both appellant and appellees are of the view that the applicable standard of review in this case is whether the Board's decision was arbitrary and capricious. That is incorrect. The issue here is not whether a particular

---

[2]    *See Dickinson v. Zurko*, 527 U.S. 150 (1999) (the United States Patent and Trademark Office is an administrative agency and as such is subject to the APA).

patent falls within the properly-understood scope of the statutory definition of a CBM patent; rather, the issue here is whether the Board properly understood the scope of the statutory definition. That is a question of law. As we shall explain, we conclude that, as a matter of law, the statutory definition of a CBM patent precludes the Board's determination. Thus the Board acted "not in accordance with law," and "in excess of statutory jurisdiction, authority, [and] short of statutory right."[3]

## 2. The Statute and the Board's Understanding

As the Supreme Court forcefully reminds, "in interpreting a statute . . . courts must presume that a legislature says in a statute what it means and means what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). In the statute before us, Congress did not leave the decision of what qualifies as a CBM patent to chance. The statute first states that "The Director may institute a

---

[3]   *SightSound Technologies, LLC v. Apple Inc.,* 809 F.3d 1307 (Fed. Cir. 2015), is miscited for the arbitrary or capricious standard. In *SightSound*, this court observed that there was no statutory-interpretation issue to be decided, because "the only legal questions regarding application of AIA § 18 were decided" by an earlier precedent of this court. *Id.* at 1315. All that was presented for decision was whether the particular patents came within the legal standards that themselves were no longer subject to dispute in the case. On that patent-specific law-application question, the court asked whether the Board's determination was arbitrary or capricious, and supported by substantial evidence. *Id.* at 1315–16. A question of legal interpretation, the statutory interpretation question that is dispositive here, is not reviewed under the 'arbitrary or capricious' or 'substantial evidence' portions of 5 U.S.C. § 706.

[CBM proceeding under § 18] only for a patent that is a covered business method patent." AIA § 18(a)(1)(E).

Congress then defined a "covered business method patent" as:

> a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service . . . .

*Id.* § 18(d)(1).[4]

### a. A Patent That Claims . . .

The statutory definition by its terms makes what a patent "claims" determinative of the threshold requirement for coming within the defined class. The first definitional question presented by this statutory provision is whether the requirement that the patent claim 'something' applies only to the first clause—*a method or corresponding apparatus for performing data processing or other operations*—or whether it applies to that clause <u>and</u> the second clause—*used in the practice, etc., of a financial product or service.* In order for a patent to qualify as a CBM patent, is it enough if the patent be one "that claims a method or corresponding apparatus," as long as that method or apparatus is in fact "used in the practice . . . of a financial product or service," even if that use is not recited, whether explicitly or implicitly, by the patent's claims? Or must the patent contain at least one claim to the effect that the method or apparatus is "used in the practice . . . of a financial product or service"?

---

[4]     There is an exception, not relevant here, for "technological inventions." For a discussion of the meaning of that term, at least as best it can be understood, see *Versata*, 793 F.3d at 1323, 1326–27.

To sharpen the question in a way relevant to this case, we must first ask, what is meant by the phrase "a patent that <u>claims</u>" something? Claims how, and in what terms? Must that 'something' be found in that part of the patent document that is toward the end of the document and preceded typically by "I (or we) claim" or "the invention claimed is," or the equivalent? If we look to the claim as such, what role do we assign to the written description?

Though this particular statutory phrasing—"patent that claims"—is not common,[5] when viewed in context this language would seem to have a clear meaning, whether in the usual noun form of "claim," or, as in this case, the verb form "claims." It invokes one of the most familiar, settled concepts in patent law, derived directly from § 112(b). It is referring to the claims of the patent, which, as properly construed, define "the scope of the patentee's rights." *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). And, as the Supreme Court instructs in such circumstances, it is therefore incorporating the established meaning of "claim." *See Evans v. United States*, 504 U.S. 255, 259–60 (1992) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).[6]

---

[5] It appears on only two other occasions and is nowhere defined. *See* 35 U.S.C. § 291 (2016); 42 U.S.C. § 262; *see also* 35 U.S.C. § 156 ("patent which claims").

[6] "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary

The matter does not end there, however. A claim in a patent does not live in isolation from the rest of the patent, as if it can be cut out of the document and read with Webster's Dictionary at hand. Established patent doctrine requires that claims must be properly construed—that is, understood in light of the patent's written description; that is a fundamental thesis in claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). Indeed, patent drafters can be their own lexicographers, using ordinary words in unordinary ways if the drafter, in the written description, clearly so indicates. It follows that under § 18(d)(1) the written description bears importantly on the proper construction of the claims. But the written description alone cannot substitute for what may be missing in the patent "claims," and therefore does not in isolation determine CBM status.

Returning to our earlier question, reading the statute as applying only to the first phrase in the statutory definition would give the CBM program a virtually unconstrained reach. Under that reading, a patent would qualify if it claimed a method or corresponding apparatus for performing *any* operations that happen to be used in "the practice, administration, or management of a financial product or service." The "practice, administration, or management of a financial product or service" phrase, as earlier noted, is not limited to the financial services industry, but reaches a wide range of sales and similar transactional activity. In fact, nearly everything that is invented can and likely will be used in someone's sale of a good or service. If that use does not have to be part of the claim as properly construed, essentially every patent could be the subject of a CBM petition—a petition filed by

direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

any person sued for or charged with infringement at any time during the life of the CBM program.

Congress intended that the CBM program was to be more limited in scope than that. Its restriction to "covered business method" patents, and its temporary nature (eight years), make clear that it is a program established for a defined set of patents, not for virtually every patent. Moreover, in the AIA, the same statute that established the CBM program, Congress carefully set out limits on the *inter partes* review ("IPR") program for review of patents after issuance. Persons sued for infringement had no more than one year to petition for IPR, and were restricted to presenting only certain §§ 102 and 103 grounds of unpatentability, thus excluding grounds based on, for example, § 101 or § 112. It is not sensible to read AIA § 18(d)(1) as obliterating these important limits for review of essentially any patent, subject only to the "technological invention" exception. *See* note 3, *supra*.

It follows that bifurcating the statute so that the phrase "a patent that claims" should apply only to the first phrase, and not to the entire definition Congress provided, would be radically out of keeping with the statute and congressional intent, considered in the context of other provisions in the statute.

Finally then, how are we to understand the phrase "a patent that claims"? It is the claims, in the traditional patent law sense, properly understood in light of the written description, that identifies a CBM patent. And for the reasons set out, what a qualifying patent must "claim" requires compliance with the clauses of the statutory definition.

We turn then to the second clause.

### b. … *a financial product or service*

The patent owner argued to the Board that the '191 patent was ineligible for CBM review because its inven-

tion was not directed to a financial product or service and can be used by institutions other than financial institutions. Specifically, the patent owner contended that covered financial products and services were limited to products and services such as credit, loans, real estate transactions, securities and investment products, and similar financial products and services.

The Board correctly pointed out that both the Patent Office in its rulemaking discussion, and this court in its then-recent *Versata* opinion, rejected that narrow view. (The patent owner submitted its argument before the *Versata* opinion issued.) We agree that the patent owner's position before the Board is incorrect as too limiting, particularly since the argument is essentially the same one made to and rejected by us in *Versata*.

The Board, however, as part of its broader consideration of what is a "financial product or service," concluded that "[t]he method and apparatus claimed by the '191 patent perform operations used in the practice, administration, or management of a financial product or service *and are incidental to a financial activity*." J.A. 10 (emphasis added). In *Versata*, to decide this part of the case it was enough to establish our jurisdiction to adjudge the question of the Board's authority in a CBM case, and to conclude, as the Board had, that the patent in that case was a CBM patent under the statute. It was unnecessary to go further and opine about where the boundaries of the CBM definition lay.

More recently, in *Unwired Planet,* 841 F.3d at 1379–82, we were called upon to determine if the Board in that case had misstated the meaning of the statutory definition of what is a CBM patent. The Board, in determining that the patent under review was a CBM, did not limit itself to the express language of the statutory definition of a CBM patent. The Board explained that the inquiry of whether a particular patent is a CBM patent involved

determining "whether the patent claims activities that are financial in nature, *incidental to* a financial activity, or *complementary to* a financial activity." *Id.* at 1378 (emphases added and citation omitted).

We concluded in *Unwired Planet* that the emphasized phrases are not part of the statutory definition, and when used "as the legal standard to determine whether a patent is a CBM patent [that standard] was not in accordance with law." *Id.* at 1382. We vacated the Board's decision and remanded for the Board to decide, in the first instance using a correct statutory definition, whether the patent at issue is a CBM patent.

In arriving at its mistaken legal standard, the Board had cited to language used by the PTO in its comments during the process of adopting regulations regarding the AIA. See, comments of the Director upon promulgation of the regulation in 2012: "[T]he legislative history explains that the definition of covered business method patent was drafted to encompass patents '*claiming* activities that are financial in nature, incidental to a financial activity or complementary to a financial activity.'" Transitional Program for Covered Business Method Patents— Definitions of Covered Business Method Patent and Technological Invention, 77 Fed. Reg. 48,734, 48,735 (Aug. 14, 2012) (Final Rule) (quoting 157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer)).

Despite these comments, in its final regulation defining what is a CBM patent the PTO simply adopted the statutory definition of a CBM patent without alteration or expansion. 37 C.F.R. § 42.301(a); *see also Versata*, 793 F.3d at 1323. The Board also referred to legislative history for remarks made by Senator Schumer. In *Unwired Planet* we found that no such extra-statutory sources were persuasive when the plain words of the

statute did not support such additional interpretive phrases. *See Unwired Planet*, 841 F.3d at 1381–82.

In the case before us, the Board as part of its broader discussion of what is a "financial product or service," concluded that "[t]he method and apparatus claimed by the '191 patent perform operations used in the practice, administration, or management of a financial product or service *and are incidental to a financial activity*." J.A. 10 (emphasis added). Consistent with *Unwired Planet*, we hold that the emphasized phrase is not a part of the statutory definition of what is a CBM patent, and, as we did in *Unwired Planet*, we conclude that such a definition of a CBM patent is beyond the scope of the statutory standard and thus "not in accordance with law."

*Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016), is not to the contrary. There the phrase used by the Board was "financial in nature," which does not involve the statutory broadening at issue in *Unwired Planet*. And the court in *Blue Calypso* agreed with the Board that "financial in nature" was an accurate overall description of the challenged claims, and therefore the patent was adjudged properly under the CBM rubric. *See Blue Calypso*, 815 F.3d at 1340.

This is not a quibble over abstract phrasing. In this case, the Board's broadened definition of a CBM patent led it, in deciding the status of the '191 patent, to reach out beyond the question of whether the claims, as understood in light of the written description, met the statutory definition. The Board, in addition to relying on language found in the legislative history and in the PTO's regulatory proceedings, took into consideration the litigation history of patent owner Secure Axcess in which it sued a large number of defendants who could be described as "financial" in their business activities.

But a patent owner's choice of litigation targets could be influenced by a number of considerations, such as the

volume of a particular target's perceived infringement; the financial condition of the target; which targets are most likely to be willing to settle rather than bear the cost of litigating; available and friendly venues; and so on. Those choices do not necessarily define a patent as a CBM patent, nor even necessarily illuminate an understanding of the invention as claimed.

To be clear: the phrasing of a qualifying claim does not require particular talismanic words. When properly construed in light of the written description, the claim need only require one of a "wide range of finance-related activities," examples of which can be found in the cases which we have held to be within the CBM provision. *See Versata*, 793 F.3d at 1312–13, 1325–26; *Blue Calypso*, 815 F.3d at 1339–40; *SightSound*, 809 F.3d at 1315–16.

In sum, if a patent that fits the term *covered business method patent*, as defined in AIA § 18(d)(1), is to be usefully distinguished from all other patents, the distinction will not lie based on non-statutory phrases like "incidental to" or "complementary to" financial activity. Such phrases can have unintended consequences. For example, it is safe to assume that most, if not virtually all, inventors of methods or products claimed in a patent have some expectation that complementary financial activity will result—stated another way, that eventually their invention will produce financial rewards for their efforts. A definition that could sweep that broadly obviously will not do. Necessarily, the statutory definition of a CBM patent requires that the patent have a claim that contains, however phrased, a financial activity element.

### 3. The Remedy

Having determined that the Board erred in deciding this case as a CBM under its overly-broad statutory definition, we are confronted with determining the appropriate remedy. Secure Axcess, believing that the Board misapplied the statute, asks that we vacate the Board's

determination that this is a CBM patent, and remand for the Board to decide the CBM question under the correct definition.

The Board considered claims 1 and 17, among others, reproduced above, as illustrative of the claimed subject matter.  J.A. at 7–8.  In the course of its decision, the Board made several claim construction determinations based on its 'broadest reasonable construction' standard, approved by the Supreme Court in *Cuozzo*.  *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142–46 (2016).  Secure Axcess objects to several of these rulings, specifically those related to the issue of whether the patent requires an authenticity key to be used to, or provide the ability to, determine the location of a preferences file, and that these claim constructions tainted the court's obviousness determinations.  However that may be, for purposes of deciding whether the claims qualify the patent as a CBM patent, we find that the Board's constructions are reasonable in light of the Board's standard of review. [7]

In that light, and giving the patentee the broad scope available for claiming "the practice, administration, or management of a financial product or service," we have examined with care the relevant claims as set forth earlier.  Based on the record before us, and applying the definition of a CBM patent provided by Congress in AIA § 18(d), and viewed as of the earliest effective filing date, we do not find in the '191 patent, when the claims are properly construed in light of the written description, a single claim that could qualify this patent as a "patent that claims . . . a method or corresponding apparatus . . .

---

[7]    *See, e.g., In re Morris*, 127 F.3d 1048 (Fed. Cir. 1997) (holding that, in reviewing a claim construction decided under the 'broadest reasonable interpretation' standard, we determine whether the interpretation is within the range of reasonableness).

used in the practice [etc.] of a financial product or service." Like the lightbulb example in *Unwired Planet*, just because an invention could be used by various institutions that include a financial institution, among others, does not mean a patent on the invention qualifies under the proper definition of a CBM patent.

A remand to the Board for further consideration of the question whether this patent qualifies as a CBM thus would be a wasteful act, since an affirmative finding, applying the proper statutory definition, that this patent so qualifies would be, in terms of the APA standard, arbitrary or capricious. The Board's conclusion that this is a CBM patent is reversed. The Board's other determinations, including claim constructions as they bear on obviousness and the obviousness determination itself, are vacated.

### CONCLUSION

Reversed in part; vacated in part.

### COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**SECURE AXCESS, LLC,**
*Appellant*

v.

**PNC BANK NATIONAL ASSOCIATION, U.S. BANK NATIONAL ASSOCIATION, U.S. BANCORP, BANK OF THE WEST, SANTANDER BANK, N.A., ALLY FINANCIAL, INC., RAYMOND JAMES & ASSOCIATES, INC., TRUSTMARK NATIONAL BANK, NATIONWIDE BANK, CADENCE BANK, N.A., COMMERCE BANK,**
*Appellees*

---

2016-1353

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. CBM2014-00100.

---

LOURIE, *Circuit Judge*, dissenting.

I respectfully dissent from the majority's conclusion that the claims of the '191 patent are not directed to a covered business method ("CBM") and hence are not subject to review under AIA § 18. *See* Leahy-Smith

America Invents Act ("AIA"), Pub. L. No. 112–29, § 18, 125 Stat. 284, 329–31 (2011).[1]

The statute defines a CBM patent as "a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions." *Id.* at § 18(d)(1). The claims of the '191 patent are surely claims to "a method or corresponding apparatus for performing data processing or other operations *used in the practice*, administration, or management of a financial product or service." *Id.* (emphasis added).

Claim 1 recites "[a] method comprising: transforming . . . received data . . . to create formatted data . . . ." '191 patent col. 12 ll. 9–18. Claim 17 recites "[a]n authentication system comprising: an authentication processor configured to insert an authenticity key into formatted data to enable authentication of the authenticity key to verify a source of the formatted data . . . ." *Id.* col. 12 ll. 62–67. There can be little doubt that such claims meet the "method or apparatus for performing data processing" limitation of the statute.

They also meet the "financial product or service" language of the statute. Examination of the '191 patent makes clear that the invention is to be used in the management of a financial service. The exemplary embodiment is described, *inter alia*, as follows:

> The customer and merchant may represent individual people, entities, or business. The bank may represent other types of card issuing insti-

---

[1]    Section 18 of the AIA, pertaining to CBM review, is not codified. References to AIA § 18 herein are to the statutes at large.

> tutions, such as credit card companies, card sponsoring companies, or third party issuers under contract with financial institutions. . . . The bank has a computing center shown as a main frame computer. However, the bank computing center may be implemented in other forms, such as a mini-computer, a PC server, a network set of computers, and the like. . . . Any merchant computer and bank computer are interconnected via a second network, referred to as a payment network. The payment network represents existing proprietary networks that presently accommodate transactions for credit cards, debit cards, and other types of financial/banking cards. The payment network is a closed network that is assumed to be secure from eavesdroppers. Examples of the payment network include the American Express®, VisaNet® and the Veriphone® network. In an exemplary embodiment, the electronic commerce system is implemented at the customer and issuing bank. In an exemplary implementation, the electronic commerce system is implemented as computer software modules loaded onto the customer computer and the banking computing center. The merchant computer does not require any additional software to participate in the online commerce transactions supported by the online commerce system.

*Id.* col. 11 ll. 22–67. Similarly, the '191 patent uses "bigbank.com" as the only exemplary URL. *Id.* col. 1 ll. 29–33, col. 8 ll. 21–23. No other applications of the invention are described in the patent.

And, if there were any doubt of the use of the invention in financial management, the identity of the companies Secure Axcess, LLC ("Secure Axcess") has sued for infringement of the '191 patent should settle the matter.

Their litigation pattern speaks volumes about what they believe their invention is "used" for.

Secure Axcess filed complaints alleging that the following companies infringe the '191 patent by "using" the invention:  PNC Bank National Association, PNC Financial Services Group, Inc., U.S. Bank National Association, U.S. Bancorp, Bank of the West, BNP Paribas, Cantander Bank, N.A., Ally Financial Inc., Ally Bank, GE Capital Retail Bank, GE Capital Bank, General Electric Capital Corporation, General Electric Company, Raymond James & Associates, Inc., Raymond James Financial, Inc., Trustmark National Bank, Trustmark Corporation, Nationwide Financial Services, Inc., Nationwide Corporation, Nationwide Mutual Insurance Company, Nationwide Bank, Cadence Bank, N.A., Commerce Bank, Commerce Bancshares, Inc., Santander Bank, N.A., Vanguard Group Inc., Vanguard Marketing Corporation, Charles Schwab Bank, Charles Schwab Corporation, Ocwen Financial Corporation, Orange Savings Bank, SSB, First Financial Bank National Association, First Financial Bankshares, Inc., Texas Capital Bank, N.A., Texas Capital Bancshares, Inc., T. Rowe Price Investment Services, Inc., T. Rowe Price Associates, Inc., T. Rowe Price Group, Inc., Bank of America Corporation, Bank of America, N.A., A.N.B. Holding Company, Ltd., American National Bank of Texas, Arvest Bank Group, Inc., Arvest Bank, Austin Bankcorp, Inc., Austin Bank, Texas N.A., Bank of the Ozarks, Inc., Bank of the Ozarks, Citizens 1st Bank, Compass Bancshares, Inc., Compass Bank, Cullen/Frost Bankers, Inc., the Frost National Bank, Diboll State Bancshares, Inc., First Bank & Trust East Texas, First Community Bancshares, Inc., First National Bank Texas, First National of Nebraska, Inc., First National Bank of Omaha, First National Bank Southwest, Sterling Bancshares, Inc., Sterling Bank, Harris Bankcorp., Inc., Harris N.A., Intouch Credit Union, Credit Union, ING Direct Bancorp, ING Bank, FSB, North Dallas Bank &

Trust Co., Zions Bancorportion, Zions First National Bank, and Amegy Bank N.A.

Moreover, at oral argument, Secure Axcess's counsel, in response to a question, stated that no companies have been sued other than financial institutions. Oral Argument at 7:15–7:30, *Secure Axcess, LLC v. PNC Bank N.A.*, No. 16-1353 (Fed. Cir. Nov. 2, 2016), available at http://www.cafc.uscourts.gov/oral-argument-recordings?-title=&field_case_number_value=2016-1353&field_date_-value2%5Bvalue%5D%5Bdate%5D=&=Search.

It is true that the word "financial" does not appear in the claims. However, that fact should not decide this case. *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1325 (Fed. Cir. 2015) (holding that "the definition of 'covered business method patent' is not limited to products and services of only the financial industry, or to patents owned by or directly affecting the activities of financial institutions"); *see also Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1338 (Fed. Cir. 2016) (affirming Board's decision "declin[ing] to limit application of CBM review to patent claims tied to the financial sector"); *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1315 (Fed. Cir. 2015) (explaining *Versata* "foreclosed" limiting the CBM patent definition to patents "directed to the management of money, banking, or investment or credit"). As a matter of patent law, claims do not necessarily need to recite uses of products. Certainly, claims to products or apparatuses do not (note that AIA § 18(d)(1) refers to a "method or corresponding apparatus"). And, if a method claim otherwise satisfies the requirements of 35 U.S.C. § 112, it need not recite an ultimate use.

The written description of the '191 patent, in accordance with the requirements of the statute, *see* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner and process of . . . using it . . . ."), tells us that the invention is to be used for

financial management. *See* '191 patent col. 11 ll. 22–67; *see also id.* col. 1 ll. 29–33, col. 8 ll. 21–23. The inventors, complying with the statute, thus told us what the invention is to be used for. The claims recite an invention *used in the practice* of a financial product, and the uses are described in the written description of the patent.

In my view, the Board correctly concluded that the "method and apparatus claimed by the '191 patent perform operations used in the practice, administration, or management of a financial product or service," in accordance with the CBM patent statutory definition. *PNC Bank, N.A. v. Secure Axcess, LLC*, No. CBM2014-00100, 2015 WL 5316490, at *5 (P.T.A.B. Sept. 8, 2015). It is true that the Board also used overly broad language in stating in the alternative that the "method and apparatus claimed by the '191 patent . . . *are incidental to a financial activity.*" *Id.* (emphasis added). And the Board did state that "the '191 patent claims a method or apparatus that at least is incidental to a financial activity, even if other types of companies also practice the claimed invention." *Id.* at *6. But overstatement does not change the basic fact that, as the written description of the patent itself indicates, the invention is directed to a method and apparatus used in financial management, as referred to in the statute. *See, e.g.*, *Blue Calypso*, 815 F.3d at 1339 n.2 (explaining the Board correctly concluded that claims referring to "an incentive program" were eligible for CBM review where the patent "repeatedly, and almost exclusively discloses 'incentive' and 'incentive program' in a financial context") (internal citation omitted).

I do recognize that the Board's overly broad language, *i.e.*, "incidental to a financial activity," has now been cabined by our recently issued decision in *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376 (Fed. Cir. 2016). That curtailment should not cause this panel to topple over an otherwise sound decision by the Board in this case that the '191 patent is directed to financial management.

Such a decision was not based only on the forbidden language. *See PNC Bank*, 2015 WL 5316490, at *10 ("Having determined that the '191 patent claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service and does not fall within the exception for technological inventions, we maintain our determination that the '191 patent is eligible for a covered business method patent review.").

The majority attempts to escape the clear purport of the invention by ranging into a discussion of the meaning of claims in patent law. Its use of language such as "on occasion," "might be considered," and "at least facially" pointedly overlooks the nature of the invention and the meaning of the statute. The opinion has subsections headed "A patent that claims . . ." and ". . . a financial product or service," but it virtually ignores the statutory language "used in the practice." The written description clearly describes how this invention is "used in the practice" of a financial product. And, while not conclusive, the post-issuance litigation history makes the point unmistakable. To ignore that is to close one's eyes to the obvious.

The majority disparages the clear use of this invention in the practice of a financial product or service by worrying that the CBM program would have "virtually unconstrained reach" and that "a patent would qualify [for CBM review] if it claimed a method or corresponding apparatus for performing *any* operations that happen to be used in 'the practice, administration, or management of a financial product or service.'" The answer to such concerns is that we need not probe the limits of the statutory language by reciting all sorts of non-financial products to show that a sensible interpretation of this statute must include what Secure Axcess itself considers a financial product. Common sense is not precluded from use in

interpreting statutes and claims. Suffice it to say that the relation of this invention to the financial world is one of substantial identity compared with an incidentally-used invention like a lightbulb or ditch-digging. *Cf. Unwired Planet*, 841 F.3d at 1382.

I therefore respectfully dissent from the conclusion that the '191 patent is not a CBM patent.